This is an appeal from a summary judgment entered by the Scioto County Common Pleas Court on the claims brought by Ray W. Thompson, a citizen, on behalf of himself and other similarly situated city taxpayers, plaintiff below and cross appellant herein, against the City of Portsmouth, Ohio (hereinafter referred to as "the City"), as well as various past and present elected City Council members, defendants below and appellants herein.[1] The following errors are assigned by appellants for our review:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED BY FAILING TO FIND THAT PLAINTIFF'S CLAIMS WERE TIME BARRED BY [SECTION] § 733.6 OF THE OHIO REVISED CODE."
SECOND ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN FAILING TO FIND THAT THOMPSON FAILED TO FOLLOW PROCEDURAL PREREQUISITES OUTLINED IN O.R.C. 733.59."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN FINDING THAT THE CHARTER WAS VIOLATED."
Cross appellant then posits his own assignments of error as follows:
FIRST CROSS ASSIGNMENT OF ERROR:
 "THE COURT ERRED IN NOT DETERMINING WHETHER PORTSMOUTH CITY ORDINANCE 1990-106 AUTHORIZED LIFE AND HEALTH INSURANCE FOR PORTSMOUTH CITY COUNCIL PERSONS."
SECOND CROSS ASSIGNMENT OF ERROR:
 "THE COURT ERRED IN NOT ORDERING PORTSMOUTH CITY COUNCIL MEMBERS TO PAY BACK TO THE PORTSMOUTH CITY TREASURY FUNDS PAID FOR LIFE INSURANCE OR MEDICAL BILLS ON BEHALF OF PORTSMOUTH CITY COUNCIL MEMBERS DEFINING 'COLOR OF LAW' AS BEING ADVICE OF COUNSEL." (Emphasis in original).
The record reveals the following facts pertinent to this appeal. On or about November 6, 1928, the citizens of Portsmouth, Ohio, adopted a Charter declaring their City a "corporate" and "body politic." This Charter gave the City various enumerated powers. It also provided that those powers were not exclusive and that the City also had "implied" or "appropriate" powers to carry out those that were enumerated as well as any other power then, or thereafter, "granted to municipalities by the [C]onstitution and laws of Ohio." Insofar as its form of government, the Charter vested "all legislative power" in a "Council" to be elected from each ward of the City. Members of Council were afforded a yearly salary of six hundred dollars ($600) except for Council President who would receive one thousand dollars ($1,000) per annum. Subsequent amendments to the Charter provided for Council to establish, by ordinance, compensation or salary schedules for officers and employees in "classified" City service. These amendments apparently led Council, over time, to extend health insurance benefits to various personnel.
On August 28, 1990, City Council held a meeting at which time an ordinance was proposed to transfer monies from their "discretionary fund" to their "operating budget." The stated purpose of this transfer was "to cover the costs of [h]ealth [i]nsurance for members of City Council, so requesting it." One member in attendance expressed that this was "only fair" and that the ordinance was "morally" and "ethically" justified given the many hours of work by Council members "away from their family in all types of weather." Some concern was nevertheless expressed over the proposal's legality as well as its potential for inciting controversy among the general public. It was therefore agreed that the City Solicitor would be asked to render an opinion on the propriety of this matter.
A second reading of the proposed ordinance was given at City Council meeting held on September 11, 1990. In response to the request made at their previous meeting, the City Solicitor stated that he had spent "quite a bit of time" studying appropriate sections of the State Constitution, Revised Code, City Charter, as well as codified ordinances made pursuant thereto, and concluded that Council did "have the authority to make these changes."[2] The proposed ordinance was also amended at that time to further provide for life insurance and to extend these benefits to the City Auditor, City Solicitor and Mayor.
A third and final reading of the proposed ordinance was given at City Council meeting held September 25, 1990. Several members voiced concern at that time over both the legality and the ethics of extending these benefits to themselves and increasing their compensation without an electoral vote. One member moved to "table" the proposal until such time as "specific written instructions" could be obtained as to its legality. That way, the member reasoned, they could "vote without fear of having it kicked back in [their] face later on . . ." The motion lost by a two (2) to four (4) vote and the proposal was then passed along the same margin. Portsmouth Codified Ordinance 1990-106 (hereinafter referred to as "Ordinance 106") was thus enacted to provide for the transfer of monies to extend "[h]ealth [i]nsurance and [l]ife [i]nsurance for members of City Council, so requesting it."
Several years passed by until cross-appellant, Ray Thompson, learned of this ordinance while reading the paper. Although retired, Mr. Thompson had served the City in various capacities over the years including police officer and Chief of Police as well as acting Public Utilities Director and City Manager. He had previously "worked" with sixteen (16) different City Councils over a span of more than thirty (30) years and could not recall any of them ever voting themselves benefits while still in office. Mr. Thompson believed that such action was "quite wrong" and that the issue was one which should have been left to the citizens in an election. He thereafter retained counsel who, on June 20, 1997, served a "Formal Request" on the City Solicitor to initiate "legal proceedings" to determine the validity of Ordinance 106 and, if found invalid, to recover the monies spent on behalf of Council members. The City Solicitor responded less than a week later and advised that he was "in the process of reviewing the matter" and would render a decision in the future. No further response was ever forthcoming.
Mr. Thompson commenced the action below on July 2, 1997, alleging that the extension of health care benefits and life insurance to City Council members was illegal and invalid because (1) Ordinance 106 only appropriated monies for that purpose but did not actually provide for the extension of those benefits; (2) extension of those benefits amounted to an increase in salary in violation of the City Charter; and (3) such actions by Council were, in any event, prohibited under Ohio law. He further averred that, since passage of the ordinance, the City had improperly paid more than $300,000 for the benefit of past or present City Council members.[3] Mr. Thompson asked for a declaratory judgment to the effect that Ordinance 106 was null and void insofar as it purported to provide health care benefits and life insurance to City Counsel members.[4] Further, the court was asked to enjoin Council members from appropriating any additional monies for these purposes in the future and to order all members who had received those benefits in the past to make complete restitution to the City and its taxpayers.
The City filed an answer denying any illegality in the provision of such health care benefits and life insurance. It also asserted, by way of affirmative defense, that (1) this lawsuit was premature and Mr. Thompson lacked standing to bring it because he had not afforded the City Solicitor sufficient time to respond to his June 20, 1997, "Formal Request" to initiate "legal proceedings;" (2) the action was time barred and commenced beyond the applicable statute of limitations; and (3) the actions of Council were taken "in good faith and on advice of the City Solicitor that their actions were lawful at the time they were taken." Finally, the City advanced that this litigation was "not a genuine case in controversy" but rather a "political" ploy designed to influence future elections. Appellant thus asked that the case be dismissed and judgment be entered in its favor.
Several months later both sides moved for summary judgment. Mr. Thompson filed his motion on December 12, 1997, seeking partial summary judgment on the issue of liability. He contended that there was no genuine question of material fact on this point and that he was entitled to a declaration that the extension of health care benefits and life insurance to City Council members was null and void as a matter of law. This contention was based on three (3) separate and distinct arguments.
First, it was argued that neither Ordinance 106 nor any other codified ordinance actually provided for the extension of those benefits to Council. That ordinance merely provided for the transfer of monies to pay for such benefits but did not specifically authorize their extension to members of City Council. Thus, Mr. Thompson concluded, there was no authority for giving health care and life insurance to Council in the first place.
Second, even if the ordinance was construed to allow for the extension of such benefits to Council, it was argued that this was in violation of the City Charter which limited salaries for Council members to six hundred dollars ($600) per annum. Mr. Thompson asserted that any direct increase in that salary, or any indirect increase through the extension of an in kind "fringe benefit," required approval of the electorate through plebiscite rather than the passage of a simple ordinance by Council itself.
Finally, he argued that the actions of Council were in violation of Ohio law. This argument was based on R.C.102.03(D) and its interpretation by the Ohio Ethics Commission which purportedly construed that statute as prohibiting "City Council from enacting an ordinance granting an in-term increase in compensation for the current members." This alone, he asserted, was sufficient to invalidate any ordinance granting health benefits or life insurance to current City Council members.
Mr. Thompson concluded by assuring the court below that he had not brought this case "to punish" Council members, but to recover "misappropriated" monies and to prevent further "unlawful disbursement of money from the public treasury." To that end, he requested that the lower court enter summary judgment finding that the extension of those benefits to Council "was not in accordance with the law, and that they be required to reimburse the City" for the monies so spent. The amount of those monies would then be determined at a later date.
On January 12, 1998, the City filed its own Motion for Summary Judgment arguing that the claims advanced by Mr. Thompson were both procedurally flawed and substantively without merit. The City began by positing that the claims against it were governed by the one (1) year statute of limitation set forth in R.C. 733.60. This statute would have required that the present case be brought no later than September 25, 1991 (i.e. one year after passage of Ordinance 106). Because the lawsuit was not initiated until July of 1997, fully five (5) years after the ordinance was enacted, the City concluded that this litigation was "time barred." The City also challenged Mr. Thompson's standing to bring this action as a taxpayer suit. This challenge was premised on the provisions of R.C. 733.59 which require a taxpayer, before initiating suit on his own, to request the City Solicitor to take such action. While conceding that such a request had been made here, the City argued that Mr. Thompson had not given the Solicitor a "reasonable" amount of time to either respond to the request or investigate the matter before bringing suit himself. The City concluded that Mr. Thompson's failure to comply with the "jurisdictional prerequisite" of R.C. 733.59 deprived him of standing to prosecute this matter and, thus, required dismissal of the case.
Insofar as the merits of this case were concerned, the City never contested Mr. Thompson's primary argument that salaries for Council members were limited by the Charter to $600 a year. Rather, it sought to draw a distinction between that which is a "salary" and that which is "compensation." The City argued that "compensation" is a broader term which, though including the concept of a "salary," also includes other forms of remuneration such as provision of insurance benefits. It was suggested that the "founding fathers" of Portsmouth were aware of this distinction and purposely did not limit other forms of compensation to Council members so that these sorts of benefits might one day be provided to them. Thus, the City concluded, Mr. Thompson failed to state an actionable claim and summary judgment should be granted in its favor.
Both sides thereafter filed additional memoranda attacking each other's arguments and, essentially, restating their own positions on these issues. Mr. Thompson intimated that the City's procedural arguments were contrived and that its argued distinction between "salary" and "compensation" had no basis in the governing Charter provisions. The City responded by citing several legal authorities to the effect that there is a valid distinction between these two (2) terms. Further, it was argued that even if there was no distinction between them, and even if the City Charter prohibited procurement of these benefits, Council proceeded in "good faith" upon the advice of the City Solicitor in passing Ordinance 160. The City concluded that such "good faith" actions, under color of state law, prohibited any personal recovery from Council members of those monies already spent on their behalf.
Oral arguments were held on the two (2) motions at which time the parties and the court below discussed these issues in considerable detail. The matter was taken under advisement and, on March 19, 1998, the trial court granted partial summary judgment to both sides. There is little in the way of reasoning or analysis set forth in that judgment. The court simply determined that, as a matter of law, "Municipal Ordinance [106], of the City of Portsmouth passed September 25, 1990, violated the City Charter and therefore is invalid." Conversely, however, the court found that Council had "acted in good faith and under color of law." Council members were, therefore, not required to make restitution of any monies previously spent on their behalf. It was also determined that Mr. Thompson's counsel was entitled to attorney fees although no amount was awarded pursuant to that determination. This appeal followed.
 I
Before turning to the merits of the assignments and cross assignments of error, we must first address a threshold jurisdictional problem. Appellate courts in Ohio have jurisdiction to review the final orders or judgments of inferior courts within their district. Section 3(B)(2), ArticleIV of the Ohio Constitution; R.C. 2501.02. The sine qua non to this grant of jurisdiction is that the judgment being appealed is a final appealable order. A final appealable order is one which inter alia affects a "substantial right" and either determines the action or is entered in a special proceeding. R.C. 2505.02 (B)(1)(2). If a judgment is not final and appealable, then an appellate court has no jurisdiction to review the matter and it must be dismissed. Prod. Credit Assn.v. Hedges (1993), 87 Ohio App.3d 207, 210, 621 N.E.2d 1360,1362 at fn. 2; Kouns v. Pemberton (1992), 84 Ohio App.3d 499,501, 617 N.E.2d 701, 702.
We note that the trial court's March 19, 1998 judgment awarded attorney fees to Mr. Thompson's legal counsel but did not specify an amount for that award. Presumably, this is an issue which has been left for future resolution. We must therefore determine whether that judgment is final and appealable despite the presence of this unresolved issue.
There are two (2) categories of final orders, as mentioned above, under which the March 19, 1998 judgment could potentially fall. The first is one which affects a substantial right and, in effect, "determines the action." That category clearly does not apply here. This Court and others have consistently held that judgments awarding attorney fees, but deferring the amount of those fees for later adjudication, do not determine the action and therefore are neither final nor appealable. See e.g. Ft. Frye Teachers Assn. v. Ft. Frye LocalSchool Dist. Bd. of Edn. (1993), 87 Ohio App.3d 840, 843,623 N.E.2d 232, 234; Cole v. Cole (Nov. 8, 1993), Scioto App. No. 93CA2146, unreported; Pickens v. Pickens (Aug. 27, 1992), Meigs App. No. 459, unreported; State ex rel. Van Meter v. LawrenceCty. Bd. of Commrs. (Aug. 25, 1992), Lawrence App. No. 91CA25, unreported; also see Bilder v. Hayes (Jan. 25, 1995), Summit App. No. 16704, unreported; Baker v. Eaton Corp. (Dec. 10, 1990), Stark App. No. CA-8235, unreported.[5]
Thus, if the judgment being appealed herein is to be classified as a final order, it must fall under the auspices of a "special proceeding." This is an area of appellate jurisprudence which has undergone considerable change in the last few years and, therefore, a review of some basic principles is appropriate. First, prior to 1993, the question of whether an action was a "special proceeding" was resolved through the employment of a "balancing test" set forth inAmato v. General Motors Corp. (1981), 67 Ohio St.2d 253,423 N.E.2d 452. The Amato test required courts to weigh the harm to the prompt and orderly disposition of litigation, and consequent waste of judicial resources, against the need for immediate review because appeal after final judgment was not practical. Id. at 258, 423 N.E.2d at 456. Quite obviously, the inherent subjectivity and lack of a definitive standard in this test led to uncertainty and, occasionally, uneven results. The Ohio Supreme Court overruled Amato twelve (12) years later inPolikoff v. Adam (1993), 67 Ohio St.3d 100, 616 N.E.2d 213 at the syllabus, and held that "special proceedings" were those which were not recognized either by common law or equity but were specially created by statute. The Ohio General Assembly stepped in five (5) years later and largely codified that holding with Am.Sub.H.B. No. 394. See 4 Baldwin's Ohio (1998) Legislative Service. A "special proceeding" is now defined as "an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity." R. C. 2505.02(A)(2).
Unfortunately, application of this statutory definition to the cause sub judice is somewhat problematic given the various claims set forth by Mr. Thompson in his complaint. He states in paragraph nine (9) of his pleading that "[t]his action is based upon the Ohio Declaratory Judgment Law" set out in R.C. chapter 2721. Declaratory judgments were unknown in the common law, see
35 Ohio Jurisprudence 3d (1982) 4, Declaratory Judgment and Related Proceedings § 1, and it is well settled that declaratory judgment actions are "special proceedings." SeeMarsh v. State Auto. Mut. Ins. Co. (1997), 123 Ohio App.3d 356,358, 704 N.E.2d 280, 281; Konold v. R.W. Sturge, Ltd. (1996),108 Ohio App.3d 309, 311, 670 N.E.2d 574, 575; Stover v. StateFarm Ins. Co. (May 21, 1998), Seneca App. No. 13-98-12, unreported; Gunlock v. Z.B.P. Partnership (Sep. 27, 1997), Clermont App. No. CA97-05-047, unreported. Were this the only consideration, and assuming arguendo that the judgment being appealed also affected a substantial right, then we would readily conclude that this court has jurisdiction over this matter and we would proceed to consider the case on its merits.
However, in paragraph ten (10) of his complaint, Mr. Thompson also sets forth that this is "a taxpayer's action to prevent further illegal expenditure of public funds... and to recover on behalf of the city and its taxpayer's funds which have been illegally expended." Taxpayer lawsuits have long existed in common law and equity and were not specially created by statute. See Pierce v. Hagans (1908), 79 Ohio St. 9, 16-19,86 N.E. 519, 520-521; Cincinnati Street RR. Co. v. Smith (1876),29 Ohio St. 291, 303. Indeed, the Ohio Supreme Court has expressly held that common law and equity allow taxpayer lawsuits (in the absence of statutory regulation) to recover money illegally paid from the public treasury to Village Councilmen. See Walker v. Dillonvale (1910), 82 Ohio St. 137,92 N.E. 220 at paragraph one of the syllabus. A taxpayer action, therefore, does not fall within the rubric of a "special proceeding" for purposes of R.C. 2505.02. It would logically follow that, if this were the only thing to consider, the judgment entered below does not fall within the second possible category of final orders and the case must be dismissed for lack of jurisdiction.
We must therefore reconcile these two (2) competing concepts (i.e. declaratory judgment and taxpayer lawsuit) and determine whether to treat the judgment being appealed herein as emanating from a special proceeding. To that end, we believe the recent decision of the Ohio Supreme Court in Walters v. TheEnrichment Ctr. of Wishing Well, Inc. (1997), 78 Ohio St.3d 118, 676 N.E.2d 890, is dispositive. The Court in Walters held that "[t]he determining factor . . . is whether the 'action' was recognized at common law or in equity and not whether the 'order' was so recognized." Id. at 118, 676 N.E.2d at 893. In making that determination, "courts need only look at theunderlying action." (Emphasis added.) Id. While it is true that Mr. Thompson sought a declaratory judgment from the court below, that judgment was nevertheless just one of the remedies sought by him as part of his taxpayer lawsuit against the City and members of Council. The other remedies he requested (i.e. permanent injunction and restitution of allegedly misappropriated funds) were also component parts of the overall taxpayer cause of action. To focus solely on one part of that action, the request for declaratory judgment, would be to violate the rule set forth in Walters that courts should look at the basis of the "underlying" claim. Given that this case was brought by Mr. Thompson on behalf of the City of Portsmouth to determine the appropriateness of municipal expenditures and to recover funds that might have been inappropriately spent, it is clear that the underlying basis for this litigation is a taxpayer cause of action. These sorts of actions, as mentioned previously, existed at common law and were not specially created by statute. Thus, the order being appealed herein did not emanate from a special proceeding and the judgment is not final and appealable pursuant to R.C. 2505.02.
We acknowledge that the court below included in its judgment a finding of "no just cause for delay." However, this language from Civ.R. 54(B) does not cure the jurisdictional defect. Attorney fees are, essentially, a measure of damages awarded to a victorious party in litigation. See State ex rel. Van Meter,supra. Damages are part of a claim for relief, rather than a separate claim in and of itself, and therefore a determination of liability without a determination of damages is not a final appealable order even with Civ. R. 54(B) language. SeeHitchings v. Weese (1997), 77 Ohio St.3d 390, 391,674 N.E.2d 688, 689 (Resnick J., Concurring): also see Horner v.Toldedo Hosp. (1993), 94 Ohio App.3d 282, 288-289,640 N.E.2d 857, 861-862. A finding of "no just reason for delay" pursuant to Civ.R. 54(B) does not make appealable an otherwise nonappealable order. McCabe/Marra Co. v. Dover (1995), 100 Ohio App.3d 139,160, 652 N.E.2d 236, 249; Cassim v. Cassim (1994),98 Ohio App.3d 576, 579, 649 N.E.2d 28, 30; Palmer v. Westmeyer
(1988), 48 Ohio App.3d 296, 302, 549 N.E.2d 1202, 1209.[6]
For these reasons, the judgment being appealed herein does not constitute a final appealable order under R.C. 2505.02 and, thus, this Court is without jurisdiction to consider the matter(s). The appeal and cross appeal are hereby dismissed.
APPEAL AND CROSS APPEAL DISMISSED.
 JUDGMENT ENTRY
It is ordered that the appeal and cross appeal be dismissed and that each party bear their own costs herein taxed.
The Court finds there were reasonable grounds for these appeals.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J. Kline, P.J.: Concur in Judgment Opinion
For the Court
 BY: ___________________________ Peter B. Abele Judge
 NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.
[1] Those Council members include Ann Sydnor, Raymond Pyles, Greg Bauer, Lisa Mamas, Jim Kalb, John Thatcher, Charles Alexander, Orin Campbell, Howard Griffin, Jeff Walburn and Gary Abrams. Although these parties joined together with the municipality in defending against the action below, this appeal has been taken only by the City of Portsmouth, Ohio. We therefore refer to "the City" throughout this opinion as the primary entity against which the lawsuit was brought. Nevertheless, where appropriate, this reference should also be read to include the above named City Council members.
[2] One Council member expressed some reservations and asked that a written opinion to this effect be obtained rather than a verbal one. However, the City Solicitor responded that state law allowed him to render opinions verbally or in writing and that he had chosen the former option over the latter. Nevertheless, he stated that he was "very comfortable" with his opinion that the extension of these benefits was legally permissible.
[3] The City health plan was initially provided through an insurance policy with "Community Mutual Blue Cross Blue Shield." However, in 1984 the City went to a "self funded plan." We therefore presume that the amount(s) set forth by Mr. Thompson in his Complaint represent direct expenditures to the health care providers for individual Council members. In 1997, after this litigation had begun, the City switched back to providing health care benefits through an insurance policy with Blue Cross/Blue Shield.
[4] It would appear that he was not challenging the ordinance insofar as extension of those benefits to the City Solicitor, City Auditor and Mayor.
[5] The reasoning behind this is that attorney fees are essentially damages awarded to a victorious party. See State exrel. Van Meter v. Lawrence Cty. Bd. of Commrs. (Aug. 25, 1992), Lawrence App. No. 91CA25, unreported. Generally speaking, judgments which determine liability, but defer the issue of damages for later determination, are not final appealable orders. See State ex rel. White v. Cuyahoga Metro. Hous. Auth.
(1997), 79 Ohio St.3d 543, 546, 684 N.E.2d 72, 72; also see GTENorth, Inc. v. Carr (1993), 84 Ohio App.3d 776, 778,618 N.E.2d 249, 250 at fn. 1.
[6] Obviously, we are also not bound by the trial court's determination that its judgment was a final appealable order.See In re Webster (Sep. 14, 1993), Athens App. No. 92CA1559, unreported; Boone Coleman Construction V. Spencer (Jun. 23, 1992), Scioto App. No. 92CA2076, unreported (Harsha, J. Concurring).